Nott, J.,
delivered the opinion of the court:
These cases are more than nineteen years old. The subject-matter of each was within the general jurisdiction of this court, and every claimant might have brought his action here within the limitation of time appointed by the statute. Moreover, the causes of action come from a remote portion of the country, and the principal witnesses are persons imperfectly speaking our language and not familiar with the duties' and obligations of witnesses in our judicial proceedings. Finally, the amounts involved are trivial, the largest in any one case being the only instance where the demand exceeds $100. But Congress, by special legislation, have referred these claims to this court with directions that the court “ take jurisdiction of and adjudge the claims,” “although the same shall not be presented within six years from the time they accrued.” (Act 1st March, 1879, 20 Stat. L., p. 324, ch. 115.)
The court sympathizes with the Assistant Attorney-General in the difficulty and embarrassment of defending trivial cases by testimony to be hunted up at great distances and after such a lapse of time; nevertheless, in compliance with the legislative will, the court proceeds to adjudicate these cases precisely as it does all others, and, after the special favor shown to them by Congress, is not at liberty to stigmatize them as stale claims.
The purpose of th,e Act to provide for the payment of horses and, *555 other property lost or destroyed in the military service, 3d March, 1849 (9 Stat. L., p. 414, ch. 129), so far as it relates to officers or soldiers furnishing their own horses, was two-fold and ex ceedingly simple; to enable the government to hire horses at low rates; to apportion the risk between the owner and the employer. A similar purpose runs through all of the legislation ol Congress which relates to this incident of warfare since the war of 1812, of which it is sufficient to refer to the first and the last, the Act 9th April, 1816 (3 Stat. L., p. 216, ch. 40), and the Act 22d June, 1874 (18 Stat. L., p. 193, ch. 395.)
Forty cents a day was the compensation allowed by the govern ment to officers and soldiers who furnished their own horses for military service (Act 1816, 3 Stat. L., p. 261, §§ 7, 8, ch. 40; Act 22d July, 1861, 12 Stat. L., p. 268, § 5, ch. 9); a rate which any person who has had occasion to hire a horse knows is not an exorbitant price to pay in civil life. But inasmuch as in the Army risks from natural causes are vastly increased, as by cold, wet, want of stabling, hard work when the horse needs rest, inaction when he needs exercise, irregularity in feeding, contagious diseases and the like, the price of forty cents per day is really a most reasonable compensation, apart from other risks.
Moreover, it is manifest that if the owners of such horses had to bear military risks proper, it would lead to a state of things prejudicial to the military service. Men would refuse to expose their horses, or would evade doing so, and many a man who would scorn to run away on his own account would deem it a sufficient justification that he could not afford to lose his horse.
^ Accordingly the Act 1849 apportions the risks. The official zeal of the accounting officers has in many instances applied the most extraordinary technical renderings to the -words of the statute (see Powell's Case, 1 C. Cls. R., 400), and Congress have come to the aid of soldiers in sweeping away such impediments (see Act 1874, 18 Stat. L., p. 193, ch. 395, and the Thomas Motion, ante), but nevertheless the purpose of the statute was plain from the first, and its language interpreted by its purpose bears but one construction and leads to but one conclusion. That purpose may be well illustrated by the numberless charter-parties of the Quartermaster Department under which transports were employed during the late war, the language of which *556 generally is, “ The war risk to be borne by the United States, the marine risk to be borne by the owners,”
Speaking in general terms, the obligations which the statute law casts upon the government are: 1st, to pay the soldier an agreed compensation for the use of his ■horse; 2d, to furnish sufficient forage for its support; 3d, to allow the soldier to retain possession of the animal; 4th, to assume all war risks concerning it; and 5th, to indemnify the owner against losses which, strictly speaking, were not covered by the term war risk, but which nevertheless u resulted from any exigency or necessity of the military service.” Conversely the obligations cast upon the owner are: 1st, that he shall keep himself well mounted, i. e., provided with a serviceable horse at all times, analogous to the stipulation in the charter-parties that the owners shall keep the vessel tight, staunch, and strong, well and sufficiently manned and furnished, and'at all times fit for merchant service; 2d,-that he shall assume all ordinary risks, analogous to the stipulation iu the charter-parties that the marine risk shall be borne by the owners; 3d, that the loss shall not be caused by his fault or negligence.
In the transport cases the courts in determining the risk have looked to the proximate cause of loss. Thus in the case of the Mannahasset (3 C. Cls. R.., 70), where a vessel was driven by a gale within reach of the enemy’s batteries, and being then safe from the perils of the sea was destroyed by reason of their firing upon her, the loss was held to have been due to a war risk.' But in Morgan's Case (14 Wall., 581), where a military officer, agaist the remonstrances of the master, comjtelled him to run his vessel over a bar in low water because of a military exigency, whereby she was injured, the loss was held to have been due to a marine risk.
Oases ■would doubtless arise in the cavalry service where it would be exceedingly difficult to determine whether the loss was or was not due to a war risk. Thus, if a horse were drowned while the owner was watering it, there could be no shadow of doubt as to his liability; but if a horse were drowned while a squadron was pursuing an enemy, and in consequence of the commanding officer’s compelling his men to swim their horses across a dangerous stream, a contested question of liability would immediately arise, on both sides of which much might be said. But the Act 1874 was passed to reach just *557 such cases, and it answers just such questions by saying: “Payment in any case shall not be refused where the loss resulted from any exigency or necessity of the military service, unless it was caused by the fault or negligence of such officers or enlisted men.” (Act 22d June, 1874, 18 Stat. L., p. 193, § 1, ch. 395.)
The instances in which the Act 1849 casts a liability upon the government for the loss of a soldier’s horse are enumerated in PoivelVs Case (1 C. Cls. B., 400, 402), and the claimants here rely upon two of those liabilities.
The first is where a loss is suffered in consequence of the United States failing to supply sufficient forage.” But in these cases it appears that the claimants furnished their own forage, for which thej were allowed and paid a commutation. Whether the government could escape liability by an officer’s forcing commutation upon soldiers against their will, instead of furnishing them with what the statute terms “ sufficient forage,” we are not called upon to decide; but we are all of the opinion that when the soldier voluntarily accepts commutation in the stead of forage in kind, the obligation is shifted from the government to himself, and he is estopped from alleging a liability on the part of the government under this provision of the statute.
The second provision relied upon is where the loss suffered was “ because the rider was dismounted, and separated from his horse, and ordered to do duty at a station detached from his horse.” In these cases the claimants were dismounted, they were separated from their horses, and they were ordered to do duty as foot soldiers at Fort Oraig, while their horses were sent to a grazing camp sixty miles distant by order of the commanding officer of the department. Tfieir cases, therefore, come within the very terms of the statute.
It is, however, objected by the defendants’ counsel that want of forage had caused these horses to run down and become unfit for service; which necessitated the riders being dismounted and separated from their horses, and that this responsibility rested upon the owners, who had furnished their own forage, and who by the terms of their contracts were bound to keep in service serviceable horses.
It is undoubtedly true that every soldier who furnishes his own horse is bound to provide himself with a serviceable ani *558 mal; that the commanding officer is the judge of what is and what is not a serviceable animal, and that he undoubtedly has power to compel a man to remount himself at any time, and, failing that, to serve on foot. But beyond this, we do not understand that the power of a commanding officer affects the liability of the government. In contemplation of the statute, the soldier is entitled to retain the care and custody of his own horse so long as he is held responsible for its loss. When for any military reason the soldier is separated from his horse, the statute steps in and shifts the responsibility to the side of the government. It makes no exception to this, and does not go behind or authorize the court or the accounting officers to go behind the main fact that the owner was deprived of his right to take cafe of his own animal. In such cases the statute regards the separation as the proximate cause of the loss, just as it regards the “loss of a horse in battle” as a proximate cause. If these claimants had lost their horses in battle, that would be the end of the inquiry, and the court would not be at liberty to go behind that cause of loss to inquire whether the loss in battle was not brought about by the unserviceable condition of the horses. We apprehend that when the statute establishes a cause of loss, and the evidence shows that that cause produced a resulting loss, it must be deemed the proximate cause, and- any cause lying behind it must be regarded as a remote cause.
With regard to the equipments, the court is of the opinion that the statute makes no discrimination between the soldier’s horse and horse equipments. Where the loss was due to the same cause the liability follows the same rule.
The judgment of the court is that the claimant, Mariano Yaldez, recover of the defendants the sum of $45.50.
Judgment will also be entered for the claimants respectively, under this opinion, in the following cases:
David Romero v. The United States, for. $37 50
Marcelino Lucero v. The Same, for. 74 50
Tomas Martinez v. The Same, for... ■ 49 00
José Ildefonso Gonzales v. The Same, for. 55 00
Juan Barranca v. The Same, for. 44 50
José Baca v. The Same, for. 76 00
Guadulivpe Gallegos v. The Same, for... 39 50
*559 Tomas Caballos v. The Same, for. 72 00
Amnda Blea v. The Same, for. 48 00
Cayetano Dominguez v. The Same, for. 67 00
Antonio Sanchez v. The Same, for........ 59 00
Neponisena Berma v. The Same, for. 77 50